Sheila D. GROVE, Janice K. Vought and Judith Ann Walker, Plaintiffs,

v.

FROSTBURG NATIONAL BANK, Defendant.

Civ. A. No. J–79–516.

United States District Court, D. Maryland.

April 22, 1982.

its policies on pay and benefits, promotions and training and educational opportunities leading to promotions. Grove also claimed retaliation for assertion of her rights under Title VII in the withdrawal of a medical prescription benefit plan, and Vought asserted retaliation in vacation benefits. The case was tried to this Court on December 1, 2, 3, 4, 8, 9 and 10, 1980, and post-trial memoranda were filed by the parties. This memorandum opinion constitutes this Court's findings of fact and conclusions of law.

### Administrative Complaints, Jurisdiction and Venue

Each plaintiff filed an administrative charge of discrimination in employment on account of sex with the Equal Employment Opportunity Commission (EEOC) on March 3, 1976. (P.Ex. 1A, 1C, 1D)[1]. Grove also filed an amended charge on April 14, 1978, charging retaliation (P.Ex. 1B). The EEOC deferred the charges to the Maryland Commission on Human Relations (MCHR), with which plaintiffs filed additional charges substantially the same as those filed with the EEOC and, in the cases of Grove and Vought, also charging discrimination in promotions and promotional opportunities. (P.Ex. 2A–D). The charges were investigated by the MCHR, which issued findings of probable cause. The Bank entered into an agreement with the MCHR on February 16, 1979, in which it undertook substantial changes in its personnel policies and practices, and appointment of Janice Vought as Head Teller. The agreement was approved by a MCHR hearing examiner on May 30, 1979.

The EEOC issued right-to-sue letters to Sheila D. Grove on January 3, 1979, on her retaliation claim, and March 8, 1979 on her original claim; and to Janice Vought and Judith Walker on January 5, 1979. This action was filed within 90 days of issuance of the letters. The conduct complained of is within the scope of that charged in the

Emily Rody, Baltimore, Md., for plaintiffs.

Joseph K. Pokempner, Russell H. Gardner, Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

SHIRLEY B. JONES, District Judge.

Sheila D. Grove, Janice K. Vought and Judith Ann Walker filed this action on May 14, 1979 under Title VII and the Equal Pay Act against Frostburg National Bank (the Bank). They alleged that the Bank discriminated against them on the basis of sex in

---

1. Plaintiffs' exhibits are abbreviated herein as P.Ex., Defendant's exhibits as D.Ex.

administrative complaints and investigated by the EEOC.[2]

Plaintiffs are female citizens of the United States and Maryland. Defendant is a federally chartered commercial bank, with its facilities located in Frostburg, Maryland, doing business in this district. It is an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), and the Equal Pay Act, 29 U.S.C. § 206(d). This Court has jurisdiction pursuant to 42 U.S.C. § 2000e–5, 29 U.S.C. § 216, and 28 U.S.C. §§ 1331, 1337. Venue is proper under 12 U.S.C. § 94.

*Factual Findings*

*The Bank: History, Organization and Personnel Practices*

Frostburg National Bank is a small, but growing bank in a predominantly rural area. It has had its main office in Frostburg for a number of years, with a drive-in facility located on the main branch premises since 1970. In 1979 it opened a branch at Frostburg Plaza. From 1973 to 1978 it operated a small branch in the Student Union Building at Frostburg State College. Its assets doubled between 1970 and 1980, and the number of employees doubled also within that period. Assets in 1980 were $32 million, full-time employees were 32, part-time employees 7.

The main office of the Bank is organized into three departments, commercial, loan and bookkeeping. Tellers are either commercial tellers or loan tellers.[3] All tellers work a window, handling transactions such as opening accounts, check cashing, savings account withdrawals, deposits in checking, savings and Christmas Club accounts, payments on utility bills, and issuing money orders and travelers checks. (See P.Exs. 22, 25). In the main branch some window transactions are normally handled only by loan tellers. Loan tellers take and post payments on loans, take payments for and provide access to safe deposit boxes, and take applications for Series H bonds.

All tellers balance their own cash drawers at the end of the day. Other regular daily duties of loan tellers include typing up papers on new loans, filing, posting loan payments received from other branches, and giving credit references. At the end of the day the loan service manager, or loan department supervisor, balances total loan payments against the ledger total for the day. The commercial department, each commercial teller handling a different account, totals Christmas Club and utility bill payments for all tellers. Other duties relating to loans are performed by loan tellers on less than a daily basis, for example, calculating interest, taxes and insurance on loans; paying real estate taxes and insurance; and checking for delinquencies and sending past due notices. Some are performed only at certain times of the year. Commercial tellers are, in rotation, assigned to work in the drive-in branch,[4] where they handle their normal window transactions and also take loan and safe deposit box payments.

Loan and commercial tellers also regularly assist their respective supervisors with various daily duties and fill in when a supervisor is absent or particularly busy. This is an expected part of their jobs.

The chief difference between the two departments is that in the main branch only loan tellers take loan payments at their windows. There was testimony that being a loan teller was a more responsible position because of the importance to the Bank of income received from loans. There has been no starting pay differential between loan and commercial tellers, although records tend to indicate that, over the years,

---

**2.** No contention has been made that this action exceeds the scope of the administrative complaint and investigation.

**3.** Loan tellers are sometimes also called note tellers.

**4.** When the college branch was in operation, commercial tellers were also assigned to work there on a rotation basis, along with another employee who worked there regularly.

At some times in the past, loan tellers were also assigned to the drive-in on a rotation basis. Now some tellers work only at the drive-in.

loan tellers receive higher salaries than commercial tellers with comparable seniority. See P.Ex. 14.

Bank hours are 9 to 5 on Monday and Friday, 9 to 3 on Tuesday, Wednesday and Thursday. Tellers must stay after customer hours until their daily work balances. They typically work fewer than 40 hours a week.

The loan tellers are under the general supervision of the loan department supervisor, or loan service manager. The commercial department in the past had a head teller and a commercial department supervisor. The head teller worked a window and handled vault and teller cash; processed overdrafts, stop payment orders and check returns; and handled bulk deposits and certain large accounts. The commercial department supervisor sometimes worked a teller window, generally supervised commercial tellers, handled certificates of deposit and wire transfers, did the daily balancing for the department, handled return items, supervised the night deposit vault, and prepared certain periodic reports. The head teller and commercial department supervisor's duties have sometimes overlapped. At present Janice Vought has the title head teller but is performing a few duties formerly assigned to the head teller and many formerly assigned to the commercial department supervisor. Another employee, Darla Plummer, is performing most of the former head teller duties. Some of the changes in duties have been necessitated by the Bank's growth and increased volume of certain transactions, for example, certificates of deposit.

The Bank's employees have traditionally been predominantly female. In 1980 there were 10 fulltime male employees and 22 females, with 3 males and 4 females working parttime. In 1979 there were 12 males and 21 females working fulltime. Two of the male employees in both years were P.J. Jenkins, bank president, and William Duncan, custodian. The male-female balance

was closer in earlier years; for example, in 1968 there were 6 males and 7 females, in 1971 8 males and 10 females, in 1974, 9 males and 13 females, and in 1977 12 males and 17 females. A more realistic picture of the work force is obtained if one remembers that for all years the male employees included a member of the Jenkins family as president and for all years except 1968 included the male custodian.

The Bank presently has five officers, P.J. Jenkins, president; David P. Willetts, vice president and cashier; Earl Wilson, vice president and assistant cashier; David M. Linn, assistant cashier; and Ronald L. Talley, auditor. Except for Jenkins, all have risen through the ranks at the Bank. All are males, the Bank has never had a female officer.

Supervisors have, with one leading exception, been males also until recently. Leona M. Rankin, the exception, served as loan department supervisor from 1965 to October 1976, and as loan officer from October 1976 to 1979. She has since 1979 been manager of the Frostburg Plaza branch of the Bank. In recent years, since this action was filed other females have been given more responsibility. Mrs. Vought was made head teller, albeit as part of the settlement of the administrative complaints, and Grove was made loan officer in 1979. Virginia Lewis has been named supervisor of the drive-in branch since 1978, and Darlene O'Rourke has served as assistant loan service manager and is expected to become loan service manager.

The boss at the Bank has since 1966 been David P. Willetts, vice president and cashier.[5] He is in charge of operations generally, including personnel policies and practices. He was aware of the Fair Labor Standards Act, the Equal Pay Act, and other federal statutes and regulations. He knew that, as a national bank, Frostburg was subject to their provisions.

The bank, until recently, had no formal job descriptions and kept no regular person-

---

5. By tradition the president of the Bank is a member of the Jenkins family, which founded the Bank. Willetts is in charge of operations and practices; practically speaking, he is the chief executive officer.

nel files on employees. Raises were recommended at the end of each year by Willetts, based primarily on his own observations [6] of employees, and approved by the Board of Directors in its January meeting. The Board generally accepted Willetts' recommendations, although they may, on occasion, have given a raise less than the amount recommended. There were no consultations with employees concerning the amount of raises, either before or after they were awarded, and no formal consultations of Willetts with department supervisors at the end of the year. There was no policy or practice, formal or informal, of reviewing the quality of employees' work with them on a yearly or other periodic basis. Employees were notified of the amount of their raises by letter at the beginning of the year. Although raises were determined on the basis of Willetts' subjective judgment, at least part of the yearly raise was in the nature of a seniority increment, or cost of living raise, since all employees received some increase in pay from year to year.

Promotions and reassignments of duties were made by Willetts, who simply told employees their assignments. Opportunities for promotion were rare because of the small size of the Bank and the stability of the work force. When promotions were available, they were not posted, nor were applications informally solicited from any employees. The fact that someone had resigned or retired did not necessarily mean the job was to be filled, and one promotion vacancy resulted from the addition of a new position. Transfers between departments were made in some instances at the employees' requests, and in others for the Bank's convenience.

In 1976 employees were asked (P.Ex. 5) to list their regular duties, and Willetts prepared personnel folders on various employees, with work histories reconstructed based on his own recollections and employee interviews, where employees were available. Past salary figures were available from payroll records. There were conflicts in testimony, some quite significant, concerning the positions and duties of various employees at different times. In part these were due to the passage of time and the understandable failure of memories. No formal personnel records or employment histories had been kept before 1976. The weight of the evidence is that the attempt to reconstruct personnel folders was not made until after administrative charges had been filed by plaintiffs. The employment records thus cannot be given the substantial weight that contemporaneous records kept in the ordinary course of business would receive. Salary figures are reliable, since they came from retained payroll records. Where witnesses substantially agreed on the nature of a particular employee's duties at a particular time, the common recollection has generally been adopted in these findings. In some instances of conflict, the testimony of persons most likely to have firsthand knowledge has been accepted as most credible.

The relatively small number of Bank employees, particularly males, over the years, makes comparisons of treatment of males and females more difficult than in cases in which there are large numbers of at least males. This does not, however, preclude a finding of a practice of discrimination on the basis of sex. *See EEOC v. Ford Motor Co.,* 645 F.2d 183, 197 (4th Cir.1981). Evidence of past practice, which is relevant in any discrimination action, is particularly important in this one, because of the relatively small number of employees involved.

The extreme stability of the Bank's employees adds to the problem. Not only were the numbers relatively small, particularly in earlier years, but employees gener-

---

**6.** The main office is a small one, arranged so that Willetts and other supervisors and officers can fairly readily observe tellers at work. Willetts testified, however, that he was not familiar with everyday operations or work of employees.

The loan and commercial departments are located on the first floor, the bookkeeping and auditing departments upstairs. When Willetts began his tenure as vice president and cashier, there were only ten other employees, including the president, all of whom worked at the main branch.

ally tended to stay with the Bank. This, of course, meant that the number of personnel decisions made, particularly promotions, was correspondingly small.

These problems were offset to some extent by the growth of the Bank in recent years. The number of employees hired for new positions over the years illustrates the growth pattern:

| | | | | |
|---|---|---|---|---|
| 1967 | – | 1 | 1974 | – 1 (parttime) |
| 1968 | – | 0 | 1975 | – 2 |
| 1969 | – | 1 | 1976 | – 3 |
| 1970 | – | 1 | 1977 | – 2 |
| 1971 | – | 3 | 1978 | – 0 (2 resignations) |
| 1972 | – | 3 | 1979 | – 4 fulltime, 4 parttime |
| 1973 | – | 1 | 1980 | – 1 parttime, (4 fulltime resignations or terminations) |

The increased business of the Bank also made necessary creation of new positions above the entry level, a loan officer position in 1976 and a branch manager and second loan officer position in 1979.

Over the years before 1979 the Bank has paid male and female tellers at different rates. Males and females with equivalent education and experience beginning around the same time have been paid the same starting salary, but males have, after a year or two, generally received larger increases in pay. This is true of David Klink and Sheila Grove, who started within six months of each other in 1967; of Andrew Crowe, Darlene Smith and Donna Conrad, who started within a week of each other in 1976; and of Keith Greig and Kathleen Arnone, who began within two weeks of each other in May 1977. It is not true of Tim Stevens and Ruth Muir, who began in October 1975; their starting salaries and raises have been identical.

Until 1977 medical insurance coverage for employees' dependents was paid by the Bank for men, regardless of whether their wives worked; women were given it only if they became the family breadwinner. Grove, for example, received dependent coverage while she was the sole support of a dependent child.

### Plaintiffs' Work Histories

Sheila Duncan Grove, a high school graduate in the business program, was employed by the Bank as a loan teller in November 1967. She had no prior work experience. Except for two periods of maternity leave, she has been employed there continuously since 1967. She was a loan teller until November, 1979, when she was promoted to loan officer. As a loan teller, she performed the general duties of loan tellers discussed above. Her yearly salaries through her employment are as follows:

| | | |
|---|---|---|
| 1967 | – | $ 2,912 |
| 1968 | – | 3,328 |
| 1969 | – | 4,160 |
| 1970 | – | 4,888 |
| 1971 | – | 5,408 |
| 1972 | – | 5,720 |
| 1973 | – | 6,032 |
| 1974 | – | 6,828 |
| 1975 | – | 7,176 |
| 1976 | – | 7,464 |
| 1977 | – | 7,764 |
| 1978 | – | 8,076 |
| 1979 | – | 8,400 |
| 1980 | – | 11,256 |

Janice K. Vought, a high school graduate with a few months' work experience as a sales clerk, began at the Bank in December 1961 in the bookkeeping department, where she worked through 1966. She resigned in 1966 but returned in 1968, after having had a child, as a parttime loan teller. From September 1968 through the end of 1969 she worked fulltime as a loan teller. After maternity leave, she returned in March 1970, working fulltime in the bookkeeping department. From January 1973 through February 1979 she was a loan teller, and her general duties were those previously discussed. On March 1, 1979 she was made head teller in the commercial department. From March through July 1979 she performed head teller duties such as handling vault cash and check return items. From August 1979 through end of 1979 she handled these duties and those formerly performed by the commercial department supervisor, such as handling certificates of deposit. Beginning in 1980 another employee, Darla Plummer, handled most of the head teller duties, handling teller cash and overdrafts, and Mrs. Vought handled the rest and the commercial department supervisor duties, except for certain auditing

duties now handled by the auditing department. Around April 1980 she ceased working a teller window, as the head teller had normally done, and worked at the commercial department supervisor desk, primarily on those duties.

There was no commercial department supervisor during this period, and Mrs. Vought retained her head teller title. Her yearly salaries from the time she began working as a fulltime loan teller are:

| | | |
|------|---|----------|
| 1969 | – | $ 4,160 |
| 1970 | – | 4,836 |
| 1971 | – | 5,356 |
| 1972 | – | 5,616 |
| 1973 | – | 6,448 |
| 1974 | – | 6,732 |
| 1975 | – | 7,176 |
| 1976 | – | 7,464 |
| 1977 | – | 7,764 |
| 1978 | – | 8,076 |
| 1979 | – | 8,400 |
| 1980 | – | 10,956 |

Judith Ann Walker, a high school graduate with no prior work experience, began working for the Bank as a commercial teller in March 1963 and remained in that position through 1977, performing general commercial teller duties. She resigned in 1978. Her yearly salaries from 1965 through termination were:

| | | |
|------|---|----------|
| 1965 | – | $ 3,224 |
| 1966 | – | 3,536 |
| 1967 | – | 3,744 |
| 1968 | – | 4,108 |
| 1969 | – | 4,524 |
| 1970 | – | 4,836 |
| 1971 | – | 5,356 |
| 1972 | – | 5,616 |
| 1973 | – | 5,928 |
| 1974 | – | 6,708 |
| 1975 | – | 7,044 |
| 1976 | – | 7,332 |
| 1977 | – | 7,632 |

*Relevant male employees' work histories*

The work histories, duties and salaries of several male employees of the Bank are relevant for comparison purposes. They are David C. Klink, Crawford M. Connor, Jr. and Ronald L. Talley.

David Klink was employed by the Bank in June 1967 as a loan teller. He had been graduated from high school in the general course and had attended Catherman's Busi-ness School for two years after high school. He had no prior work experience. Drafted into the U.S. Army in October 1967, he returned to the Bank in June 1969, working as a loan teller through 1975. He performed general loan teller duties and occasionally, upon request or on his own, performed others. When the drive-in branch was opened in 1970, Klink "set it up" at the request of Willetts, stocking it with supplies and equipment. In 1971 he assumed extra duties in connection with the safe deposit boxes, reviewing the rents due at the time, and occasionally writing collection letters and arranging for drilling boxes. Loan tellers including Klink collected box rents from customers at their windows and sent out form notices of rent due. In the early 1970's Klink began operating the Bank's shredding machine; this was an occasional task. Since 1976 Klink has done the paper shredding on occasional Saturdays, for which he receives and sells the shredded paper.

Klink was designated "head note teller" in the directors' minutes for January 1971, but the title entailed no additional duties. He was designated "assistant loan service manager" in the 1972 minutes, but performed no additional duties in 1972. Neither title was made known to other loan tellers or apparently to Leona Rankin, who was then the loan department supervisor. Neither was a position that had existed before Klink's tenure.

In October 1976 Klink was promoted to loan department supervisor [7] and performed the duties of that job through October 1979. He was made a loan officer in November 1979, but continued to act as loan department supervisor, with restricted activity as a loan officer. Since May 1980, Darlene O'Rourke has had the title assistant loan service manager and is preparing to take over the position. Klink's salary history is as follows:

| | | |
|------|---|---------|
| 1967 | – | $ 2,912 |
| 1969 | – | 4,680 |
| 1970 | – | 5,408 |

---

**7.** The decision to promote Klink was apparently made in January, since Willetts identified that as the date of promotion. Klink assumed his new duties in October.

| | | |
|---|---|---|
| 1971 | – | 6,500 |
| 1972 | – | 6,812 |
| 1973 | – | 7,592 |
| 1974 | – | 8,568 |
| 1975 | – | 9,000 |
| 1976 | – | 9,360 |
| 1977 | – | 9,744 |
| 1978 | – | 10,140 |
| 1978 | – | 10,548 |
| 1980 | – | 11,256 |

Crawford M. Connor, Jr., a high school graduate, was employed in the Bank in March 1964. He had six months' experience as a teller with another bank. After spending two weeks in the bookkeeping department, he became a commercial teller, performing normal teller duties through June 1964. After training by Mrs. Vought, he became the bookkeeping department supervisor, or accounting services manager, serving from June 1964 through the end of 1969. In 1970 he worked as a commercial teller, performing the usual duties. He served as head teller from 1971 through August 1973. In late 1975 or early 1976 Connor began doing some extra work with Willetts on the transfer to an accrual accounting system and assumed or assisted with some of the commercial department supervisor duties. In late 1975 or early 1976, he assumed the duties of commercial department supervisor. He resigned in July 1979. His salary history is:

| | | |
|---|---|---|
| 1965 | – | $ 3,900 |
| 1966 | – | 4,420 |
| 1967 | – | 4,922 |
| 1968 | – | 6,200 |
| 1969 | – | 7,200 |
| 1970 | – | 8,200 |
| 1971 | – | 9,200 |
| 1972 | – | 9,672 |
| 1973 | – | 10,140 |
| 1974 | – | 11,424 |
| 1975 | – | 12,000 |
| 1976 | – | 12,480 |
| 1977 | – | 12,984 |
| 1978 | – | 13,512 |
| 1979 | – | 14,064 |

Ronald Talley began working for the Bank as a commercial teller in April 1971. He was a high school graduate with three semesters of college at Frostburg State College. He had attended a fourth semester but was dropped for unsatisfactory scholarship at the end of the fourth semester. He had no prior work experience. He performed regular commercial teller duties through most of 1973. In the fall of 1973 he was named manager of the Frostburg State College branch,[8] performing regular commercial teller duties along with another commercial teller through 1976. He also served as liaison with college officials for students' complaints; was responsible for opening and closing the Bank, although he did not always open it; and for transferring the daily work to the main branch of the Bank. Talley began attending classes at the college in the fall of 1975 and was sometimes absent from the Bank to take classes. In January 1977 he was transferred back to the main branch, where he worked as a commercial teller and occasionally assisted Willetts with work on the accrual accounting system. In late 1978 or early 1979 he was made auditor, a new position. He was graduated from Frostburg State College, with a major in accounting, in May 1980. His salary history is:

| | | |
|---|---|---|
| 1971 | – | $ 3,328 |
| 1972 | – | 4,472 |
| 1973 | – | 5,616 |
| 1974 | – | 6,708 |
| 1975 | – | 7,500 |
| 1976 | – | 7,800 |
| 1977 | – | 8,112 |
| 1978 | – | 8,448 |
| 1979 | – | 9,888 |
| 1980 | – | 14,784 |

Plaintiffs' primary claim is that the Bank discriminated against them by paying them lower wages than males doing substantially equal work. This claim is brought under the Equal Pay Act of 1966, as well as Title VII. Although the pay claims have the same factual basis, differences in the limitations period, burden of proof, and remedy require separate consideration of the two.

### Equal Pay Act

■ The Equal Pay Act, 29 U.S.C. § 206(d)(1), prohibits discrimination in rates of pay on the basis of sex

---

**8.** The college branch was a small one, staffed by Talley and one other teller. It was not a "full service" branch. Regular window transactions were handled, but there was no loan officer there.

for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system, (ii) a merit system, (iii) a system which measures earnings by quantity or quality of production, or (iv) a differential based on any other factor other than sex. . . .

The burden is on the plaintiff to make a prima facie showing, by a preponderance of the evidence, that the employer pays different wages to males and females for equal work requiring equal skill, effort and responsibility under similar working conditions. *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974); *EEOC v. Aetna Ins. Co.,* 616 F.2d 719, 724 (4th Cir.1980). Once that showing is made, the employer has the burden of showing, by a preponderance of the evidence, that the pay differential is justified under one of the four statutory exceptions. *Corning Glass,* 417 U.S. at 196–97, 94 S.Ct. at 2228–2229.

Only substantial equality of work need be proved; the jobs need not be identical. *Brennan v. Prince William Hosp. Corp.,* 503 F.2d 282 (4th Cir.1974); *Hodgson v. Fairmont Supply Co.,* 454 F.2d 490 (4th Cir.1972). A wage differential is justified by extra tasks only if they create "significant variations in skill, effort and responsibility between otherwise equal jobs." *Prince William Hosp. Corp.,* 503 F.2d at 285. If the purported extra tasks are not done; if females also have extra tasks of equal skill, effort and responsibility; if females are not given the opportunity to do the extra tasks, or if the tasks only involve minimal time and are of peripheral importance, they do not justify a wage differential. *Id.* at 286. Where some extra tasks are done but they require no skill, effort or responsibility greater than the regular tasks performed by both males and females, they do not make a job unequal and justify higher wages. *Id.* at 288–90; *Fairmont Supply Co.,* 454 F.2d at 494–97.

Sheila Grove performed work substantially equal to that of David Klink from 1969 through September 1976. Janice Vought performed substantially the same work from 1973 through September 1976. As loan tellers, all had basically the same duties, which are outlined above, and the duties entailed the same level of skill, effort and responsibility. Klink had some extra tasks from time to time. He "set up" the drive-in branch in 1970. He reviewed the safe deposit box rent records and noted some delinquencies and increases in 1971. After 1971, he arranged for drilling boxes. Sometime in the 1970's he began shredding paper.

Setting up the drive-in branch in 1970 was a one-time task, involving taking supplies and equipment from the main branch to the drive-in installation. To the extent that it may have involved any different skills or effort than the normal work of the loan tellers, they were largely physical. Moreover, no female loan teller had an opportunity to perform this task, because it was done at the request of Willetts.

All loan tellers, including Klink, occasionally sent out form notices of safe deposit box rent due and collection letters. After a period of time with no response or payment, boxes had to be drilled open. Before 1971 the boxes were under the general supervision of Earl Wilson, and he arranged for the drilling. Around 1971 Klink, apparently on his own as an outgrowth of his normal duties, reviewed the box rent records and found that some rents were long delinquent and that some customers should be billed for larger boxes. After 1971 Klink began arranging for drilling the boxes. He and the other loan tellers continued to send out rent notices and form letters. Although Klink's initiative in bringing the box rents up to date is commendable, the work he did in reviewing the records did not consume a significant amount of time, as compared with his other duties, in 1971. Again, it was a one-time project. To the extent that he performed extra tasks thereafter in comparison with others in arranging for drilling, no significant amount of time was involved. The testimony was that drilling a

box might be necessary once or twice a year.

Shredding paper is admittedly a task involving less skill, effort and responsibility than the regular work of the loan tellers. It did not involve a significant amount of time, only occasional afternoons or Saturdays.

Plaintiffs Grove and Vought have sustained their burden of demonstrating that their work as loan tellers was substantially equal to that of Klink through September 1976. Klink received a higher salary than Grove beginning in 1969, when he returned from military service, through September 1976. He received a higher salary than Vought in 1973 and 1974, although she had previously worked for the Bank from 1961 to 1966 and from September 1968 on. The salaries of Grove, Vought and Klink for the years all were loan tellers were as follows:

| | Klink | Grove | Vought |
|---|---|---|---|
| 1969 | $ 4,680 | $ 4,160 | |
| 1970 | 5,408 | 4,888 | |
| 1971 | 6,500 | 5,408 | |
| 1972 | 6,812 | 5,720 | |
| 1973 | 7,592 | 6,032 | $ 6,448 |
| 1974 | 8,568 | 6,828 | 6,732 |
| 1975 | 9,000 | 7,176 | 7,176 |

Defendant tried to justify Klink's higher salary on two grounds. It stated that Klink was paid a higher salary than Grove when he returned to the Bank in 1969, which was perpetuated through yearly increases, as a reward for his "patriotism" in serving in the Army. It did not claim that Klink received any significant education or training in the service that justified his higher salary. The Bank also claimed that Klink received higher pay because he was more responsible, conscientious and harder working, that is, on merit.

Defendant has failed to show by a preponderance of the evidence that Klink's 1969 salary was based on a factor other than sex under § 206(d)(1)(iv). Even assuming that military service could be a proper reason for a wage differential, Klink was drafted into the service. No female worker could have been.

■ Defendant has also failed to show that the wage differential was based on a legitimate merit system or other factor not based on sex. A merit system need not be in writing to be recognized; it must, however, be an organized and structured procedure with systematic evaluations under predetermined criteria. *EEOC v. Aetna Ins. Co.,* 616 F.2d at 725. If it is not in writing, the employees must be aware of it. *Id.*

The system of evaluating employees for raises used by Willetts during the relevant period does not meet this test. It was not organized or structured; Willetts did not recall, for example, whether he had consulted with department supervisors at the end of each year concerning individual employees. A systematic evaluation, using predetermined criteria, was not made. Although Willetts cited a number of factors that influenced his pay decisions, his testimony indicated that these were not applied uniformly, and he eventually admitted that the primary criterion was his "gut feeling" about the employee. Finally, although employees were aware that raises were determined at the beginning of each year, they were not aware of the existence of any merit system.

■ This action was filed on March 14, 1979. Under the Equal Pay Act, the limitations period is two years, three years if a wilful violation is shown. A violation is wilful if the employer knows or has reason to know, that his employees are subject to the Act. *E.g., Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 459–62 (D.C.Cir. 1976); *Brennan v. Heard,* 491 F.2d 1 (5th Cir.1974); *cf. Spagnulo v. Whirlpool Corp.,* 641 F.2d 1109 (4th Cir.1981) (applying

FLSA definition of wilful to ADEA claim for liquidated damages). Willetts testified that he knew the Act applied to the Bank, although he believed it was in compliance. Good faith in the criminal sense is not an issue on the limitations question. The three-year period applies to this case, and damages would run from March 14, 1976.

In October 1976, however, Klink assumed the duties of loan service manager, a position that involved significantly different duties from those of loan tellers. Although tellers assisted Klink from time to time, or substituted for him when he was absent, the bulk of their work consisted of the duties that have previously been discussed. With respect to the period after October 1976, Grove and Vought have failed to make a prima facie showing of substantial equality. They may, however, recover the wage differential between Klink's last salary as a loan teller in 1976 and their own lower salaries as loan tellers in the succeeding years, together with the same increments by which their pay was raised. Comparison may be made, under the Equal Pay Act, between male and female employees who successively occupy a position as well as between those who occupy it contemporaneously. *E.g., Pearce v. Wichita County*, 590 F.2d 128, 133 (5th Cir.1979). Backpay is limited, to March 1979 for Vought and to November 1979 for Grove, the dates on which they ceased to be loan tellers.

Vought also claims that she has been paid an unequal salary as head teller and commercial department supervisor from 1979 to the present, in comparison with Crawford Connor, the previous incumbent. She performed substantially the same duties as head teller from March through July 1979 that Connor had previously performed in that job, and from August 1979 through the end of 1979 Vought performed other duties as well. Her yearly wage in 1979 was $8,400. Connor's yearly wages in 1971 through 1973, a period when he was clearly performing only head teller duties, were $9,200 for 1971; $9,672 for 1972, and $10,-140 for 1973.

Vought claims unequal pay, compared with Connor, for August 1979 through March 1980, when she performed head teller duties and commercial supervisor duties and from April 1980, when she assumed commercial department supervisor duties. Her salary for 1979 was $8,400, for 1980 $10,956. Connor's yearly salary was $12,984 in 1977, $13,512 in 1978, and $14,064 in 1979.

To evaluate the equality of the duties performed, it is necessary to review the history of the head teller and commercial department supervisor positions. Connor had served as a head teller from 1971 through August 1973. The Bank then hired Joseph Paletta, a former employee of another local bank, as head teller in September 1973. He served in that capacity, until March 1977. From September 1973 to sometime in 1975, Connor performed commercial teller duties and assisted with other work. Sometime in 1975 he replaced David Linn as commercial department supervisor. When Paletta left as head teller in 1977, Connor, with the increased assistance from the commercial tellers, performed head teller and commercial supervisor duties. He also had substantial assistance from Talley during this period. Connor did this until Vought took over the head teller job in March 1979. Thereafter he performed only commercial supervisor duties until he left the Bank at the end of July 1979.

After Connor left the Bank, Vought retained her head teller title but assumed commercial supervisor duties. Unable to perform all the tasks of both positions, she received assistance from tellers, chiefly Darla Plummer, so that by the beginning of 1980 Plummer was performing the main head teller duties of handling teller cash and processing overdrafts and returned checks. Vought finally ceased working a teller window, a normal duty of the head teller, around April 1980.

Although the question is close, Vought has sustained her burden of demonstrating that her duties and effort as head teller and acting commercial department supervisor during the period from August 1979 through March 1980 were substantially

equal to those of Connor in the period from August 1977 through February 1979, when he was also covering both positions. In the period when he had both jobs, Connor sometimes worked a teller window, although much less frequently than the head teller formerly did. The same was true of Vought. Connor received some help from Darla Plummer and from Talley, who handled certificate of deposit income checks and helped Connor prepare the federal reserve report. Vought did not perform some jobs that Connor had done while filling both positions and later as commercial department supervisor. They are preparation of federal reserve reports, monthly reconciliation of corresponding bank statements, bimonthly reconciliation of Treasury tax and loan account, and computation of calls made against the Treasury tax and loan account. All these were transferred to Talley after Connor left, and it is not clear that Vought ever had the opportunity to do them. The reconciliation duties require no level of skill greater than reconciliations performed by Vought on other accounts and no substantial amount of time. The same is true of computations of the calls made against the Treasury tax and loan account. During the April 1979 through March 1980 period, Vought apparently received increasing assistance from Darla Plummer with some major head teller duties, but at the same time the volume of certificates of deposit significantly increased the amount of time necessary to perform that duty. The level of skill necessary to perform the certificate of deposit work is substantially equal to, or greater than, that required to handle teller cash and process overdrafts and check returns.

From April 1980 Vought has performed all commercial supervisor duties done by Connor in 1975 through 1977 and again in 1979, with the exceptions previously noted. She has retained some duties formerly performed by the head teller, such as ordering vault cash and computing charges on some larger accounts, and, as noted, the volume of certificates of deposit work has substantially increased. She has carried her burden of demonstrating substantial equality of her present duties, although she retains the title of head teller, with those performed by Connor as commercial department supervisor.

The Bank asserts that the inequality in Vought's pay, with respect to the periods when she assumed commercial supervisor duties is based on a neutral factor, its practice of not increasing an employee's salary above normal percentage increases when he assumed new duties. It points to the fact that Connor received no increase beyond a normal percentage increase when he began to assume the commercial supervisor duties. The Bank has, however, sought to justify other wage differentials in this case on the basis of assumption of additional, or more responsible, duties. More important, the argument misperceives the nature of the burden under the Equal Pay Act. Once a prima facie case is made of substantial equality of work, the employer must show why the female is not earning the same pay as the male performing the same duties, not why she did not receive a raise from her former pay.

The deficiencies of the Bank's attempt to justify unequal wages under the merit exception to the Act have been previously addressed, and apply to this instance as well. I find, therefore, that the Bank has failed to meet its burden of demonstrating that the wage differential was done to a sex-neutral criterion. Vought is entitled to recover the difference between her pay and the pay of Connor.

Judith Walker claims she was not paid wages equal to those of Ronald Talley and Crawford Connor. She worked as a commercial teller throughout her employment with the Bank, performing the duties previously discussed. Talley worked as a commercial teller performing the same duties from 1971 through the fall of 1973. He transferred to the college branch in 1973, where he continued to perform the duties, along with others. He was designated branch manager and was responsible for opening and closing the bank, although he did not always do so, and for transfer of daily work to the main branch. Those tasks

were routine, ministerial ones, sometimes performed by the other commercial teller at the branch.

Talley was not the supervisor of the work of the other commercial teller who worked at the branch. He did act as the Bank's representative with college officials, fielding complaints and explaining Bank policies. This occurred about once a week. Although perhaps not involving extra skill or effort, it at least entailed somewhat more responsibility than the ordinary commercial teller duties. Walker has failed to show substantial equality of work with respect to the period Talley was assigned to the college branch.

Talley was transferred back to the main branch in January 1977. He performed regular commercial teller duties until he was made auditor in 1978. He also performed some extra tasks in connection with the Bank's transfer to an accrual accounting system and sometimes assisted Connor with commercial supervisor duties. Talley testified himself, however, that he worked a window most of the time and that he did some accrual accounting system work off and on. He testified that Willetts and an outside CPA firm were doing the bulk of the work and that Charlotte Folk, Connor and Talley at times performed routine calculations in connection with it. It is clear from Talley's own testimony, that these extra tasks did not involve any skills or responsibility beyond that performed by commercial tellers. The duties did not consume a significant portion of his time. Walker has made a showing of substantial equality of work with Talley in 1977 and part of 1978. Walker left the Bank in 1977. Her yearly salary for 1977 was $7,632, and Talley's was $8,112.

The Bank contends that Talley's salary for that period was based on a neutral factor, its practice of not reducing salaries when employees were transferred or their job assignments changed. Having found that Talley's work while at the college branch involved some tasks of greater responsibility than Walker's, this argument must be considered.

Similar transfers or cutbacks in duties occurred in a few other instances. Connor went from bookkeeping department manager to commercial teller in 1970, and from head teller to commercial teller in 1973, and his salary was not adjusted for the changes. Charlotte Folk was working as a commercial teller and bookkeeper and transferred to work in bookkeeping in 1971, and no adjustment was made.[9] Vought had been a loan teller in 1969 and returned in 1970 as a bookkeeper with no pay reduction. Other transfers have been to more or less equal, or to higher paid jobs, for example, transfers from bookkeeping to teller.

█ This policy has been applied to women as well as men. I find, therefore, that the Bank has sustained its burden of demonstrating an exception to the Equal Pay Act under § 206(d)(1)(iv).

Walker has also sought equal pay in comparison with Crawford Connor. Connor was performing commercial teller duties, and only those duties in 1970 and again from September 1973 to 1975, when Paletta was head teller. In the latter period he performed some other tasks, such as filling in for Paletta to a greater extent than other commercial tellers, but Walker has made a sufficient showing of substantial equality. For the reasons discussed above regarding Talley, however, the Bank has carried its burden of demonstrating an exception to the Act. Before Connor became a commercial teller in 1970 and again in September 1973, he had performed different and, in the latter case, significantly more responsible duties.

Walker has not claimed unequal pay with regard to any other male employees. Her claim under the Equal Pay Act must be denied.

### Title VII claims

Plaintiffs assert a Bank policy of discrimination on account of sex in pay and benefits, promotion and educational opportuni-

---

**9.** The evidence indicates a slightly lower pay rate for bookkeeping employees.

ties. They proceeded on both disparate treatment and disparate impact theories, disparate treatment with regard to all claims and disparate impact with regard to the promotion criteria used by the Bank. Grove and Vought also claim retaliation, Grove in the withdrawal of prescription coverage, Vought in the amount of vacation allowed in 1979.

A Title VII plaintiff may proceed under the alternative theories of disparate treatment or disparate impact. Disparate treatment, in the context of this case, covers a situation in which an employer treats female employees less favorably than males on account of their sex. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Discriminatory motives must be proved, although those motives may be inferred. *E.g., Wright v. National Archives & Records Serv.,* 609 F.2d 702, 713 (4th Cir.1979). Recent Supreme Court cases, beginning with *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), have established a system of presumption and shifting burdens of production for demonstrating discriminatory motive, *Wright,* 609 F.2d at 713. A plaintiff must first make a prima facie case of discrimination. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Brown v. Eckerd Drugs, Inc.,* 663 F.2d 1268, 1271 (4th Cir.

1981). This step is "not onerous," *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; in this instance plaintiffs must show unequal pay and benefits or failure to promote or afford educational opportunities in circumstances that give rise to an inference of discrimination. The burden of production then shifts to the employer; he must "articulate some legitimate, nondiscriminatory reason" for the personnel action. *Id.* He meets his burden of production if he produces evidence sufficient to raise an issue of fact as to whether he discriminated against the plaintiff.[10] *Id.* at 254–55, 101 S.Ct. at 1094. The burden of production then shifts back to the plaintiff to show that the reasons offered are not the true reasons, that they are only a pretext, and merges with the burden of persuasion. *Id.* at 253–56, 101 S.Ct. at 1093–95.

A disparate impact case involves apparently neutral employment practices that fall more harshly on, in this instance, females than males and cannot be justified by business necessity. *Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15. Proof of discriminatory motive is not required; a prima facie case, in this context, requires proof of a facially neutral employment policy, applied to both males and females, that imposes a disproportionately heavy burden on females. *See id.* The employer then bears the burden of demonstrating that the policy has a manifest relationship to the employment in question.[11] *Griggs v. Duke*

---

10. It is at this point that the burdens of production and proof in Title VII and Equal Pay Act actions differ. In an Equal Pay Act case, plaintiff must first make a prima facie case of substantial equality of work and unequal pay. The burden then shifts to the employer to demonstrate, by a preponderance of the evidence, that the wage differential is based on a sex-neutral factor under the exceptions to the Act. It stays with the employer.

Title VII expressly excludes sex discrimination in wages that is authorized by one of the exceptions to the Equal Pay Act. 42 U.S.C. § 2000e–2(h). If an employer can successfully establish one of the affirmative defenses to the Equal Pay Act, when the burden remains with him, he will necessarily be able to defeat a Title VII action. Whether the converse is true is not entirely clear. *But see Laffey v. Northeast Airlines, Inc.,* 567 F.2d 429 (D.C.Cir.1976). In the-

ory, a case could exist in which an employer produces evidence sufficient to meet the *Burdine* production burden but insufficient to carry the burden of persuasion under the Equal Pay Act. If plaintiff is then unable to carry her burden of demonstrating pretext, she cannot recover under Title VII.

11. The effect of *Burdine* on disparate impact analysis is unclear. *Compare Johnson v. Uncle Ben's, Inc.,* 657 F.2d 750 (5th Cir.1981) *with NAACP v. Medical Center, Inc.,* 657 F.2d 1322, 1333–36 (3d Cir.1981). Disparate impact cases involve three steps, as do disparate treatment cases, but courts have differed significantly on what the employer must show at the second stage, *see Contreras v. City of Los Angeles,* 656 F.2d 1267, 1276–80 (9th Cir.1981) (reviewing cases). The employer's burden in a disparate impact case has been described as more strin-

*Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). If the employer shows job relatedness, the plaintiff may overcome the showing by demonstrating that another practice would serve the employer's legitimate purpose with a less harsh effect. *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1979); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). The key to a disparate impact case is proof of a standard policy or practice. *Wright,* 609 F.2d at 712.

### Limitations under Title VII

■■■■ Under Title VII, and cases interpreting it, an administrative complaint must be filed within 300 days of a discriminatory act. Failure to pay equal wages is a continuing violation, so that limitations do not begin to run until the last day of unequal pay, not the first. *Jenkins v. Home Ins. Co.,* 635 F.2d 310 (4th Cir.1980). Administrative complaints were filed while all plaintiffs were still employed at the Bank, and still receiving allegedly unequal pay and benefits. These claims are clearly timely.

Plaintiffs assert that before 1979 the Bank had a continuing practice or policy of affording promotions primarily to males and keeping females in lower paid positions. Where a continuing violation is involved, the practice must have continued through the relevant limitations period and must have been applied within that period. *See Brown v. Eckerd Drugs, Inc.,* 663 F.2d 1268, 1276 (4th Cir. 1981); *Patterson v. American Tobacco Co.,* 586 F.2d 300, 304 (4th Cir. 1978). In this case by the time of trial plaintiffs did not allege that the discriminatory practice was still in effect. The Bank had in 1979 begun posting promotional opportunities and had developed job descriptions and qualifications for various positions. Plaintiffs do contend, however, that

the discriminatory practice continued after the administrative complaint was filed and before suit was instituted.

■■■■ Defendant contends that plaintiffs' promotion claims are time barred because even if a discriminatory promotional practice or policy is shown, plaintiffs were denied no promotion within the appropriate period before the administrative complaint was filed. Where a continuing practice is shown, something less than actual denial of a promotion may be required. *Cf. Brown v. Eckerd Drugs, Inc.,* 663 F.2d 1268, 1276 (4th Cir.1981) (class member who has not applied for promotion may share in class monetary recovery if she can demonstrate that she would have applied for promotion but for the discriminatory promotion practice). As discussed below, the Bank did not have a practice of making potential promotions known, and not all promotions were occasioned by employees' leaving, nor did it require or solicit applications from anyone. A plaintiff can hardly be required to apply for a promotion to a vacancy she did not know existed until after someone else received the promotion. *See Hairston v. McLean Trucking Co.,* 520 F.2d 226, 231 (4th Cir.1975). There were two promotional decisions apparently made within the limitations period, however. David Klink actually began serving as loan service manager in October 1976, but the decision to promote him was, according to Willetts, made as early as January 1976.[12] Connor replaced Linn as commercial department supervisor, or assumed the duties of that position, in late 1975 or early 1976. Plaintiffs have sufficiently shown instances of application of the promotional policy within 300 days before their administrative complaints were filed to avoid a limitations bar, provided a continuing practice or policy is shown.

### Wage Claims

Each of the plaintiffs more than made out a prima facie case of unequal pay under

gent than in a disparate treatment case, *Ste. Marie v. Eastern R.R. Ass'n,* 650 F.2d 395, 399 n. 2 (2d Cir.1981), and it may not necessarily follow that *Burdine* has changed that burden.

12. Willetts testified that Klink was promoted in January 1976, and his history shows an entry for January 27, 1976. The recollection of several witnesses, including Leona Rankin, whom Klink replaced, was that Klink assumed Rankin's duties in October 1976.

Title VII. As previously noted in the discussion of the Equal Pay Act claims, at most of the times in question they worked as tellers, as did some males, performing substantially the same duties. Vought later performed substantially the same work as head teller and commercial department supervisor as had Connor.

■ The record of salaries of males and females from 1969 through 1980 showed that, except in one instance, male and female employees in the same or similar positions usually started at the same salary but after a year or two males were paid more. This practice continued through 1979. This evidence of past discrimination against females generally can certainly be considered as evidence on the individual claims. *E.g., Goodman v. Schlesinger,* 584 F.2d 1325, 1331 (4th Cir.1978). In one instance, a male's starting salary was higher than those of females beginning at the same time or than those of females already working for the Bank in the same or similar positions. This was true of Connor, who started at the Bank in 1964 at a higher rate than Vought was making after over two years at the Bank. The same was true in one instance of a female. Virgina Lewis received a higher starting salary in 1971 than Ronald Talley and Kathy Patterson. In a few instances, females received higher salaries than other females in roughly the same position in terms of duties and seniority, but not higher than males in the same circumstances.

■ Throughout this period of time, a single individual was for all practical purposes the one who determined pay. He was a male. No objective criteria for determining the amount of pay had been set, in writing or otherwise. An inference of discriminatory motive for disparate treatment of women as to pay can clearly be drawn. *Stastny v. Southern Bell Tel. & Tel. Co.,* 628 F.2d 267, 299 (4th Cir.1980) (dictum).

■ The Bank's practice of paying health insurance coverage for males automatically and for females only when they became the family breadwinners, and then only upon request, was clearly disparate treatment based on illegal sex discrimination. The Bank attempted to meet the charge with evidence that dependent coverage was given females if they became the sole support of dependents. This "breadwinner" theory is not a "legitimate, nondiscriminatory reason" sufficient to meet the burden of production when the evidence was that no inquiry was made to determine whether males were the sole support of dependents, it was simply assumed they were. This practice tends to support the inferences concerning the motive for the disparate treatment in pay.

■ The Bank advanced several justifications for inequality in pay: differences in amount of work or kind of duties performed by the males, either at the time of comparison or in the past; better job performance by specific males; and greater dedication, responsibility, or the like by males. With respect to David Klink, one of the justifications for his higher wages in the relevant period was the payment of a bonus or reward for patriotism when he returned from military service in 1969. For the reasons previously stated, this cannot be regarded as a legitimate, nondiscriminatory reason for disparate treatment. The others are not facially discriminatory, although they are subjective. An articulated reason for disparate treatment is not automatically discounted simply because it is subjective, although subjective reasons are subject to particular scrutiny. *E.g., Page v. Bolger,* 645 F.2d 227, 230 (4th Cir.1981); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

### Difference in Duties

The Bank pointed to differences in duties performed by certain males as a justification for their higher salaries. In some instances, for example, with respect to Klink's "promotions" for 1971 and 1972, the Bank failed to show that any extra duties were actually performed. In other instances, it did demonstrate the performance of additional duties, for example, with respect

to Talley's duties at the college branch and Klink's duties as loan service manager. Willetts testified, however, that Klink's raise in 1977, after he became loan service manager, was only the standard percentage raise for the year, none of it was due to his increased responsibilities. He testified that the Bank had no policy of extra compensation when new duties were assigned, only when "official" promotions were made. It was apparently not the case with respect to official promotions either. For example, neither Klink nor Rankin received any raise in 1976 or 1977, after both had been promoted, other than one of approximately four percent.[13] See P.Ex. 14. Moreover, raises over the norm were granted to males even when no additional duties were assigned or assumed. For example, Keith Grieg, a commercial teller, started at $4800 a year in May 1977 and received a raise to $6120 in November 1977 and to $7320 for 1978. Kathleen Arnone, also a commercial teller, started two weeks before Greig in 1977 at $4800 and received a raise to $6120 in 1978. The evidence presented by the Bank simply failed to demonstrate the kind of correlation between increased duties and raises that it urged.[14]

The Bank asserted that salaries were different because of better work, more dedication to the job, greater motivation or responsibility, a better attitude and the like. It should be noted at the outset that the Bank did not claim that the work performed by any of the plaintiffs was unsatisfactory, although Willetts complained about the bad attitude of Grove and Walker in "always complaining"[15] and Walker's absenteeism in the period before she resigned. For example, Willetts and Wilson both tes-

tified that Klink was the kind of employee who asked for things to do when he was not occupied, rather than simply doing assigned tasks. The 1971 project involving bringing safe deposit box rents up to date bears this out. Leona Rankin, loan department supervisor, testified that certain duties were assigned to Klink and other loan tellers at the end of the day and at other times. Her testimony, which I find credible since she was Klink's supervisor, indicated that some of the jobs that Willetts and Wilson thought were done by Klink voluntarily were assigned tasks. Rankin indicated, however, that Klink more often than Grove performed duties not assigned to him. With respect to other male employees, although the Bank showed that Connor and Talley at times performed various extra duties, for example, working on the accrual accounting system, there was no evidence that they volunteered for these tasks or assumed them on their own. Most important, as previously indicated, some males received greater raises than comparable females without performing such duties. Willetts admitted that the number of hours worked was not the primary factor in determining the amount of raises.

Attitude or motivation may have been a factor in some cases, but the experience of Talley and Crowe demonstrates that the factor was not uniformly applied. Willetts testified that Talley was returned to the main branch in 1977 because of a complaint of a male teller who worked with him that Talley left the Bank during working hours, at busy times. He admitted that Talley had had an unsatisfactory attitude about customer service, but Talley was made audi-

---

13. Rankin's was 4.03%, Klink's 4.10%.

14. The salary of Ronald Talley did increase substantially between 1978, when he was made auditor, and 1979. This seems to be the only such instance.

15. With respect to Grove, Willetts identified her complaints about low pay. Grove testified that she had complained to Willetts in 1972 about the difference in her salary and Klink's and was told that he was the breadwinner of his family and needed more money. In April 1972, after she had had a child she went back

to Willetts because she was a breadwinner, and Willetts told her that men were the primary financial support of their families, and she was not and she could either accept her pay or quit. The complaints to Willetts appear to be protected activity under the "opposition" clause of Title VII, 42 U.S.C. § 2000e–3(a), Armstrong v. Index Journal Co., 647 F.2d 441, 448–49 (4th Cir.1981). There was no testimony that Grove was disruptive or disorderly in voicing these complaints. Willetts identified no other examples of Grove's "bad attitude."

tor nonetheless. Andrew Crowe is a male former employee described by Willetts as having had a bad attitude, for which he was discharged in 1979. He nonetheless received a slightly higher raise in 1978 than a female teller hired at the same time as he; she is still employed at the Bank. Female employees who, according to Willetts, exhibited dedication and initiative, such as Rankin, Folk, and Shareen Crabtree, were not rewarded for these qualities by higher pay.

 Viewing the evidence as a whole, plaintiffs have carried their burden of demonstrating that the reasons advanced by the Bank for higher male wages were pretextual, largely after-the-fact justification for particular cases. Although part of the problem was simply the informal, ad hoc way in which personnel decisions were made, the evidence demonstrates that the system, or lack of it, operated in favor of males, despite their fewer numbers. Plaintiffs have demonstrated the existence of a practice beginning at least in 1969 of paying females lower wages than males on account of sex.

### Promotion Claims

 Plaintiffs contend that the Bank had a continuing policy of denying promotions or promotional opportunities to women, in violation of Title VII. Alternatively, they allege that the promotion practices or criteria were facially neutral but had a disparate impact on women. As has been noted previously, promotions, like raises, were awarded on subjective criteria, inconsistently applied. Vacancies were not posted or made known on an informal basis. As also noted, however, opportunities for promotion were rare. During the period from 1967 through 1979, five promotions were made. Crawford Connor was made head teller in 1971 and commercial department supervisor in 1975; Ronald Talley was named college branch manager in 1973; Leona Rankin was made a loan officer in 1976; and David Klink was made loan service manager in 1976. In 1973 the Bank filled a head teller

opening from outside by hiring Joseph Paletta. Walker claims discrimination in connection with the two head teller openings, Grove in connection with those and the 1976 loan service manager slot, Vought in connection with the 1976 loan service manager position.

Although the number of promotions made over the years is small, plaintiffs have made a prima facie case of a practice of disparate treatment of women with regard to promotions. One woman, Leona Rankin, was promoted to loan service manager in 1965 and to loan officer in 1976. Other promotions went to males, despite their lower representation in the ranks of tellers. Males were promoted over females with similar educational backgrounds and the same or greater years at the Bank. When Connor was made head teller in 1971 three female commercial [16] tellers had more experience with the Bank. Charlotte Folk had 16 years experience, 9 more than Connor, and Judith Walker had been there 7½ years, one more than Connor. Talley was named manager of the college branch after two years experience as a commercial teller; Folk, Winner and Walker had greater seniority, respectively, of 16½, 9½ and 7½ years. Klink was made loan service manager over Grove, a loan teller with equal seniority, and Vought a loan teller with 6½ years more at the Bank. Connor was promoted in 1975 over the same female commercial tellers with greater seniority mentioned above, although he had had experience as a head teller. The women mentioned were qualified for the promotions mentioned, having had considerable experience in their respective departments. At the times of these promotions there were no special educational qualifications for the jobs. A reasonable inference can be drawn, especially in light of the Bank's other policies, that females were denied these promotions because they were females.

The hiring of Joseph Paletta cannot be deemed discrimination on the basis of sex. Regardless of the Bank's business reasons

---

**16.** Vought had been with the Bank 9 years, as a bookkeeper and a loan teller.

for hiring Paletta from the outside, in this instance female and male employees at the Bank were treated equally.

The analysis regarding promotion does not end with the determination that a prima facie case of a discriminatory practice has been made. Each plaintiff must show she was qualified for a particular promotion, that the practice was applied to her. Walker has done so only with respect to the 1971 promotion of Connor to head teller and Grove and Vought only with respect to the 1976 promotion of Klink to loan teller. Plaintiffs have argued that loan tellers were qualified to be promoted to positions in the commercial department, since loan tellers had equal or greater duties. The Bank's lines of progression were from teller positions in a department to supervisory positions in that department,[17] with the bookkeeping department sometimes a first step into either the loan or commercial department. The weight of the evidence is that it was not discriminatorily applied.

The Bank offered little evidence as to why Connor was selected for the head teller job in 1971,[18] other than some vague references to his greater leadership or bank management potential. As was then customary, no one else was considered for the position. Willetts testified that he "might" have offered the job to Folk and "maybe" she did not want it. She testified, and I find her testimony credible, that she was never offered the position. I therefore conclude that the Bank has failed to meet its burden of production with respect to Walker's prima facie case concerning the 1971 promotion.

Grove and Vought have made a prima facie case with respect to the 1976 promotion of Klink as loan service manager. Each was qualified for that position. The Bank has met its burden of production with respect to Klink by evidence, supported with some specific examples, of his greater initiative and willingness to "look for

work." As has been previously discussed, however, one of the main defects in the Bank's promotion practices is the fact that females were not even considered for promotion. I find, therefore, that Grove and Vought have demonstrated, by a preponderance of the evidence, that the reasons advanced for Klink's promotion were pretextual.

*Educational Opportunities*

The Bank has a policy of paying for the cost of employees' work-related education and training, such as college courses and special seminars. In many instances, courses or training sessions are offered by bank trade or governmental groups, and notices that the courses are to be offered are sent to the Bank. Plaintiffs contend that the Bank discriminated against females in offering the opportunity to take such courses. When notices came to the Bank, men were asked if they were interested, but women were not. The Bank met its burden of production with respect to this claim. Willetts testified that he left notification to Earl Wilson, who testified that he passed the word around, usually by telling the supervisors or someone else in the department, for anyone interested to contact Wilson or another officer. He also recalled that on a few occasions he simply made a general announcement in the lobby. Although it is possible that on some occasions, plaintiffs and other females were not told of particular courses, this seems to be a function of the informal, word-of-mouth system for disseminating information. Leona Rankin testified that she was aware of the courses through Wilson, and Charlotte Folk testified that she was specifically offered the opportunity to take them. Plaintiffs have failed to meet their burden of persuasion with respect to discrimination against females in connection with educational opportunities.

17. Vought, a loan teller, was made head teller in 1979 pursuant to the agreement with the MCHR.

18. The Bank offered more evidence in connection with Connor's later promotions, job assignments, and salary, but very little relating to the 1971 assignment.

*Retaliation*

Grove's retaliation claim arose out of the Bank's action on September 30, 1977. The Bank had, as has been previously noted, afforded group medical insurance benefits to employees, including dependent coverage for males and, in limited circumstances, females. On June 30, 1977, because of a change in insurers, prescription coverage was added to the medical benefit package. P.Ex. 10. Female employees with working husbands were asked to waive dependent coverage. Grove and Vought refused, and their attorney wrote the Bank. After consultation with its own counsel, the Bank offered dependent coverage to all employees. It also cancelled prescription coverage. A memorandum of September 30, 1977 to all employees (P.Ex. 7) announced the cancellation:

> In order that our bank will not be in violation of the Federal Equal Pay Act, as it affects health care benefits of employees, additional dependent coverage has been purchased on all employees, effective October 1, 1977.
>
> In our new plan with Massachusetts Mutual Life Insurance Company, we originally included a drug plan for all employees where any prescription could be obtained for payment of only $1.00. This plan was approved by the Board of Directors because the over-all cost was not more than previous insurance carried through Lincoln National, even with enhanced benefits payable under the new protection with Massachusetts Mutual.
>
> However, the increased cost of total dependent coverage has resulted in a cancellation, effective today, in the drug plan for all employees.

Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice . . . ." 42 U.S.C. § 2000e–3(a). The action of Grove and Vought in refusing to waive medical benefits coverage and, through their attorney, objecting to the discriminatory provision of dependent coverage was clearly protected activity. *Armstrong v.* *Index Journal Co.,* 647 F.2d 441 (4th Cir. 1981). Retaliation claims often involve discharge, *e.g., id.,* and have also been sustained where a former employer provides a bad reference, *e.g., Pantchenko v. C.B. Dolge Co.,* 581 F.2d 1052 (2d Cir.1978). In this instance, however, the Bank did not discriminate against Grove and Vought in taking the action it did, which is what the statute prohibits, it took away prescription coverage from everyone. Even if unfair, the action was not discriminatory.

Vought asserts a retaliation claim of an individual nature. She testified that the Bank rule had been that after 15 years employees received 3 weeks vacation and that employees who returned to the Bank after an absence got credit for their prior time.

When she had 15 years service in 1977, counting all employment time, Vought asked Linn whether she would receive 3 weeks. A few weeks later an employee handbook was distributed stating that the rule was 3 weeks vacation time after 15 years' consecutive service. Vought asserts that the change in policy was in retaliation for her having filed an EEO complaint.

Title VII prohibits adverse employment decisions in retaliation for an employee's filing an EEOC complaint, testifying, or otherwise participating in an investigation. 42 U.S.C. § 2000e–3.

Not every personnel decision an employer makes that has an adverse effect on a complainant is proscribed; Title VII is not intended to prohibit actions taken for legitimate reasons. Although the situation had arisen only once before, an inference can be drawn from the timing of Vought's request and the institution of the new policy, that the change was occasioned by her request. *See Croushorn v. Board of Trustees,* 518 F.Supp. 9 (D.Tenn.1980). At the time the policy was changed, although it applied to everyone, Vought was the only employee to whom the rule would apply adversely. The facts and the inferences that can be drawn are sufficient to make a prima facie case of retaliation.

The Bank introduced no evidence, such as testimony on the length of time the handbook was in preparation or when the policy decision was made, to rebut the prima facie case. The timing involved here and the fact that Vought was the only employee who could be affected give rise to reasonable inferences that the Bank's action was taken in retaliation for her having filed a discrimination complaint. Although the question is close, I find that Vought has sustained her burden of proof.

### Remedies

Employees who prove a violation of the Equal Pay Act may recover back wages, limited to two or three years if the violation is wilful, before suit is filed. 29 U.S.C. § 216(b). Liquidated damages in an amount up to the amount of the wages may also be awarded. The language of § 216(b) is mandatory, *e.g., Richard v. Marriott Corp.,* 549 F.2d 303, 305 (4th Cir.), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977), but it is subject to a limited exception of 29 U.S.C. § 260. Section 260 provides:

> [I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

The exception puts " 'a plain and substantial' " burden on the employer of demonstrating that the failure was in good faith and predicated upon reasonable grounds. *Marriott Corp.,* 549 F.2d at 306 (quoting *Wright v. Carrigg,* 275 F.2d 448, 449 (4th Cir.1960)). The only evidence of good faith offered by the Bank was Willett's testimony that he believed the Bank was in compliance. Nothing was offered to show on what grounds this belief was based. The Bank has failed to sustain its burden, and liquidated damages must be awarded.

Interest on back pay awards under the Equal Pay Act is not awarded if liquidated damages are. *Hodgson v. American Bank of Commerce,* 447 F.2d 416, 422–23 (5th Cir.1971). Attorneys' fees are recoverable by a successful plaintiff, 29 U.S.C. § 216(b).

Title VII affords the power for a broad range of remedies. *See* 42 U.S.C. § 2000e–5(g). Although the Court has discretion in determining what remedies are appropriate in particular cases, when a plaintiff has prevailed, there is no discretion to deny injunctive relief completely, *see United States v. County of Fairfax,* 629 F.2d 932, 941 (4th Cir.1980), and very little discretion in awarding back pay, *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 415–20, 95 S.Ct. 2362, 2370–72, 45 L.Ed.2d 280 (1975).

The Bank has, by its agreement with the MCHR, changed a number of its policies and practices. Injunctive relief is nonetheless mandatory. A similar situation had occurred in *County of Fairfax,* in which an affirmative action plan had been instituted. The United States Court of Appeals for the Fourth Circuit noted, in remanding the case on the merits, that where discrimination was found, the Court is "under a duty to render a decree which will both eliminate past discrimination and bar discrimination in the future." 629 F.2d at 941. The trial court could not rely on the defendant's good faith but should have enjoined future discrimination. *Id.* at 941–42.

Back pay is to be awarded as a matter of course. *Albemarle Paper Co.,* 422 U.S. at 419–20, 95 S.Ct. at 2372. It may only be denied for reasons that, if applied generally, would not frustrate the purposes of Title VII. *Id.* at 421, 95 S.Ct. at 2373. Absence of bad faith is not such a reason. *Id.* at 422, 95 S.Ct. at 2373.

An award of back pay under Title VII requires the construction of a plaintiff's hypothetical work history had discrimination on the basis of sex not occurred, against which the actual work history is compared. The difference in pay between the two is awarded. *EEOC v. Korn Indus-*

tries, Inc., 662 F.2d 256, 263 (4th Cir.1981); White v. Carolina Paperboard Corp., 564 F.2d 1073 (4th Cir.1977). For example, where the claim is one of unequal pay, the starting salary for an equivalent male is used as the starting point and routine cost-of-living or seniority raises are computed over the years. See Korn Industries, 662 F.2d at 263.

■ When back pay is awarded for denial of a promotion, the hypothetical work history assumes that the promotion was granted to the person found to have been denied it and similarly reconstructs a subsequent history. See White, 564 F.2d at 1086–87. Where more than one plaintiff proves discrimination in connection with a single promotion, the pay differential is split, since both could not have received the promotion. See id. Back pay is, however, limited to two years before the administrative complaint was filed. 42 U.S.C. § 2000e–5(g). In this case the cut-off date is March 1, 1974.

■ In addition to back wages, retroactive adjustments in benefits, keyed to the increases in past compensation, are commonly awarded to make a successful Title VII plaintiff whole for past discrimination in compensation. E.g., Meadows v. Ford Motor Co., 510 F.2d 939 (6th Cir.1975), cert. denied, 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1976).

Prejudgment interest on Title VII back pay awards has been awarded by some courts. E.g., EEOC v. Pacific Press Publishing Ass'n, 482 F.Supp. 1291 (N.D.Cal. 1979). Recent Fourth Circuit cases do not specifically address the question, but indicate that interest was not awarded. See Korn Industries, 662 F.2d at 263. Attorneys' fees to a prevailing party are allowable under Title VII, 42 U.S.C. § 2000e–5(k), and they are to be awarded in the absence of special circumstances. Albemarle Paper Co. v. Moody, 422 U.S. 405, 415, 95 S.Ct. 2362, 2370, 45 L.Ed.2d 280 (1975).

■ Where, as here, plaintiffs prevail on both an Equal Pay Act claim and a Title VII claim, remedies must be tailored so as to give the plaintiffs the benefit of having prevailed on both claims but avoid duplication.

### Grove's back pay

■ This Court has determined with respect to Grove that she should have been paid wages equal to those of David Klink through the end of September 1976. The period for which she may recover, reading Title VII and the Equal Pay Act together, is restricted to that beginning March 3, 1974, and ending in October 1979, when she was promoted to loan officer and her pay was raised. These calculations are as follows:

| | 1974 (10 mos) | 1975 | 1976 | 1977 | 1978 | 1979 (10 mos) |
|---|---|---|---|---|---|---|
| Klink's salary | 7,140 | $9,000 | $9,360 | $9,744 | $10,140 | $8,790 |
| Grove's salary | 5,690 | 7,176 | 7,464 | 7,764 | 8,076 | 7,000 |
| Back pay | 1,450 | 1,824 | 1,896 | 1,980 | 2,064 | 1,790 |

Grove would also be entitled to share back pay beginning from the date of Klink's promotion, but since this Court has found that Klink only received the usual yearly increments and no raise by virtue of the promotion, additional back pay will not be allowed.

### Walker's back pay

Because Walker has demonstrated a wage differential beginning in early years but has failed to prove substantial equality of duties with certain males at various times, her back pay calculation requires construction of a hypothetical work history,

with allowances for periodic raises as a commercial teller. For some years the Bank simply used an across-the-board increase. For others, although the amounts varied, everyone received a raise, but amounts varied. Although not entirely satisfactory, the percentage of Walker's own raise has been applied to the greater amounts comparable males received.

Walker began at the Bank in March 1963 as a commercial teller, Connor in March 1964. Even if it is assumed that some credit was given for his six months experience with another bank, he was making $63.00 a week as of April 6, 1964, Walker

$57.00. Walker's hypothetical salary history begins with a weekly salary of $63.00 for 1964, $3,276 yearly. Her actual yearly pay for 1964 was $3,004,[19] and for 1965 was $3,224. The raise of $220 was an increase of approximately seven percent (7%) over her 1964 salary. The seven percent increase was applied to the 1964 hypothetical salary to obtain the 1965 hypothetical salary. Similar calculations of Walker's actual percentage increases were made for succeeding years and applied to the reconstructed salary history. Shown below are the reconstructed salaries for 1964 through 1977, with the percentage applied indicated in the parenthesis:

| 1964 | 1965 (7%) | 1966 (9.7) | 1967 (5.9) | 1968 (9.7) | 1969 (10) |
|---|---|---|---|---|---|
| 3,276 | 3,505 | 3,845 | 4,072 | 4,467 | 4,914 |
| 1970 (6.9) | 1971 (10.7) | 1972 (4.9) | 1973 (5.6) | 1974 (13.2) | 1975 (5) |
| 5,253 | 5,815 | 6,100 | 6,442 | 7,292 | 7,657 |
| 1976 (4.1) | 1977 (4.1) | (one month) | | | |
| 7,972 | 692 | | | | |

Walker's back pay calculations are as follows:

| | 1974 (10 mos) | 1975 | 1976 | 1977 (1 month) |
|---|---|---|---|---|
| Reconstruction | 6,077 | 7,657 | 7,972 | 692 |
| Walker | 5,590 | 7,044 | 7,332 | 636 |
| Back pay | 487 | 613 | 640 | 56 |

Walker is also entitled to adjustment of her comparative salary history on account of the 1971 promotion denial. The overall history of salaries at the Bank indicates, however, that raises above the usual increments were not given when persons moved

to new jobs, so no additional increase has been made.

### Vought's back pay

Vought is entitled to recover back pay for unequal wages as compared with Klink as follows:

| | 1974 (10 mos.) | 1975 | 1976 | 1977 | 1978 | 1979 (3 mos.) |
|---|---|---|---|---|---|---|
| Klink | 7,140 | 9,000 | 9,360 | 9,744 | 10,140 | 2,634 |
| Vought | 5,610 | 7,176 | 7,464 | 7,764 | 8,076 | 2,100 |
| Back pay | 1,530 | 1,824 | 1,896 | 1,980 | 2,064 | 534 |

**19.** The 1964 figure was obtained by multiplying the various weekly salaries of Walker in 1964, shown on her employment history (D.Ex. 42), by the applicable number of weeks and adding the subtotals. Figures for all later years are taken from P.Ex. 14.

Vought is also entitled to recover for the inequality compared with Connor for April 1979 through 1980:

| | 1979 (9 mos.) | 1980 (1979 + 4%) |
|---|---|---|
| Connor | 10,548 | 14,626 |
| Vought | 6,300 | 10,956 |
| Back pay | 4,248 | 3,670 |

Vought is also entitled to back pay, using $14,626 plus the percentage applied for raises in 1981 as a comparison, to the present or so long as she performed the duties she was performing in 1980. Vought's salary after 1980 was not available at the time of trial.

### Other Relief

Liquidated damages under the Equal Pay Act are awarded in favor of Grove in the amount of back pay for March 14, 1976 through October 1979 and in favor of Vought in the amount of back pay for March 14, 1976 through the present or so long as she performed the duties. In Grove's case the calculation previously mentioned can be made on the basis of information available, as follows:

| | |
|---|---|
| 1976 $(\frac{292}{365} \times 1896)$ | 1517 |
| 1977 | 1980 |
| 1978 | 2064 |
| 1979 (10 months) | 1790 |
| | 7351 |

Vought's liquidated damages through the end of 1980 are:

| | |
|---|---|
| 1976 | 1517 |
| 1977 | 1980 |
| 1978 | 2064 |
| 1979 | 4782 |
| 1980 | 3670 |
| | 13,933 |

An amount equal to back pay after 1980 is also awarded.

Prejudgment interest on back pay awards may be awarded in Title VII cases, in the court's discretion. I do not deem it necessary in the cases of Grove and Vought, who have been awarded substantial liquidated damages, although not for the entire period for which back pay has been awarded. Walker is, however, entitled to interest to make her whole for the discrimination suffered, and interest at the rate of six percent (6%), calculated for the sake of convenience from the last day of each year for which

back pay has been awarded, is hereby awarded. An injunction will be entered directing the appropriate adjustments in employer contributions to the pension plan in light of the back pay here awarded and the calculation of Vought's vacation time based on total service with the Bank. Vought will be awarded one week's pay for the years in which she was denied an extra week's vacation as additional relief on her retaliation claim.

An injunction prohibiting future discrimination by the Bank against females in pay and promotions will be entered. As prevailing parties, plaintiffs are entitled to an award of attorneys fees, the amount to be set at a hearing on the question, and costs.

### PERMANENT INJUNCTION AND JUDGMENT ORDER

For the reasons stated in the foregoing Memorandum, it is, this 22 day of April, 1982, by the United States District Court for the District of Maryland, hereby

ORDERED:

1. That judgment is hereby entered in favor of Sheila D. Grove in the amount of $16,905, $9,554 for back pay and in the amount of $7,351 liquidated damages, with interest and costs.

2. That judgment is hereby entered in favor of Janice K. Vought in the amount of $31,679, $17,746 for back pay and $13,933 for liquidated damages, both calculated through 1980 with interest and costs. Back pay and liquidated damages through the present are further awarded, and a supplemental order in a sum certain will be entered upon the Court's being advised of Vought's 1981 and 1982 salaries.

3. The Bank shall compute the entitlement of Janice K. Vought to vacation based on her total years of employment with the Bank, and judgment shall be entered in her favor in the amount of one week's pay for all years in which she was entitled to receive three weeks vacation, based on total time with the Bank, but did not.

4. That judgment is hereby entered in favor of Judith Ann Walker in the amount of $1,796, together with prejudgment interest at six percent (6%), together with interest and costs.

5. That the Bank is directed to make the appropriate adjustments of the amounts of employer contributions to its pension plan in light of the back pay awarded herein, so as to treat each plaintiff as having received the back pay awarded in the year for which it is awarded.

6. The Bank is hereby enjoined from discriminating against female employees on the basis of their sex in pay and promotions, including but not limited to such discrimination against the named plaintiffs.